**Mark ELIAS, Appellant,**

v.

**MR. YAMAHA, INC., d/b/a Team Mr. Honda, Yamaha, Appellee.**

**No. 08–99–00100–CV.**

Court of Appeals of Texas, El Paso.

Oct. 12, 2000.

Corey W. Haugland, James, Goldman & Haugland, P.C., El Paso, for appellant.

Don Studdard, Patrick A. Groves, Studdard & Melby, Jeffrey D. Rago, El Paso, for appellee.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

ANN CRAWFORD McCLURE,
Justice.

Mark Elias (Elias) filed suit against Mr. Yamaha, Inc., d/b/a Team Mr. Honda, Yamaha (Mr. Yamaha) for violations of the Texas Deceptive Trade Practices Act (DTPA), breach of contract, fraud, and conversion arising out of Elias's attempted purchase of a jet ski. Following a bench trial, the court found that Mr. Yamaha committed fraud, had breached its contract to sell a jet ski to Elias, and had converted the jet ski offered by Elias as a trade-in on the purchase of a new jet ski. The court awarded actual damages in the total amount of $1,738, attorneys' fees through the entry of judgment in the sum of $11,000, and punitive damages in the sum of $3,000. On appeal, Elias attacks the trial court's adverse finding on his DTPA claim, and the amounts awarded for loss of use and attorneys' fees. We modify the damage award, reform the judgment, and affirm as reformed.

## FACTUAL SUMMARY

On March 28, 1998, Elias visited the sales floor of Mr. Yamaha where he had purchased several jet skis in the past. He saw on display a red 1998 GSX Limited Sea–Doo jet ski and spoke to Ryan Seavey, a salesperson he knew from prior dealings. After negotiating a base sales price of approximately $7,999 and discussing the possibility of using his 1996 Sea–Doo as a trade-in, Elias decided to purchase the GSX Limited. He left a $100 deposit with Seavey, explaining that he did not want the display model sold to someone else as had happened to him the previous year. Seavey assured Elias that the display model would be his. Elias agreed to bring his 1996 Sea–Doo into the store for appraisal on April 1 and his brother, Matthew Elias, delivered the jet ski on that date.[1] The following day, Elias entered into a written contract with Mr. Yamaha for purchase of the GSX–Limited for the total price of $9,986.33. Because Elias was "upside down"[2] with respect to his trade-in, the purchase price included the $989 difference between the trade-in value and the amount Elias still owed on it. Mr. Yamaha did not inform Elias that it had sold the display model red GSX–Limited to Ricardo Lopez on April 1.[3]

Elias initially intended to finance the purchase through his local bank, Bank CNB. However, he agreed to seek financing from a company known as HRSI based upon Seavey's representations that HRSI might structure the deal with no down payment and no payments for nine months. Elias was familiar with HRSI because the company had financed his 1996 Sea–Doo. Although he did not expect to have any difficulty obtaining financing, he told Seavey to utilize Bank CNB in the event HRSI refused funding. As it turned out, Seavey called Elias on April 3 and told him that HRSI had refused to finance the purchase. Consequently, Elias called Robert Juarez, his loan officer at Bank CNB. Juarez agreed to approve financing, called Michelle at Mr. Yamaha, told her that Bank CNB would provide financing, and asked her to fax him the purchase order. The purchase order faxed to Juarez lacked a serial number and Juarez informed Elias that he needed the serial number in order to complete the loan. Elias, in turn, called Seav-

---

1. At the same time he delivered the trade-in jet ski, Matthew also delivered another jet ski that needed repairs.

2. This term means Elias owed more than the trade-in or market value of the item. Elias owed $4,189 on the loan as of April 2, but Mr. Yamaha valued the trade-in at only $3,200.

3. The sales contract between Lopez and Mr. Yamaha indicates that his base price was $7,530. There is no explanation in the record for the $469 discrepancy between the base sales price contained in Lopez's contract and the $7,999 base sales price contained in Elias's contract. The two sales contracts involved the identical watercraft model and were signed only one day apart.

ey who told him for the first time that Mr. Yamaha had sold the GSX–Limited to someone else. Seavey promised Elias that they would order one and that it would be available in one or two weeks. Since it was clear they would not obtain a serial number immediately, Juarez put the deal "on the back burner" until April 20, when he learned that Seavey had told Elias that the jet ski should arrive "any day." Elias went to the bank on April 22 to sign a loan application. According to Juarez, the financing would have been completed in less than a day once he received the serial number. The jet ski did not arrive in April. In early May, Mr. Yamaha once again led Elias to believe that the jet ski would be delivered soon, but it did not arrive in May either. Unbeknownst to Elias, Mr. Yamaha had not even ordered the jet ski despite Seavey's representations to the contrary.

As a result of the delay, Elias was required to make the April and May payments on his 1996 Sea–Doo which he intended to trade in for the new model.[4] Although Elias did not yet know it, Mr. Yamaha had sold the trade-in to Richard Escobar on May 6, 1998 for $4,668. Mr. Yamaha did not immediately deliver title to Escobar since it had not completed the deal with Elias and paid off the loan. Mr. Yamaha told Escobar that he would receive the title within three to four weeks. In the meantime, a Parks and Wildlife officer stopped Escobar at an area lake, questioned him about title to the jet ski, and warned him that he would be given a ticket. When Escobar called to inquire at Mr. Yamaha, he was told that the bill of sale would serve the purpose until they received his title. Escobar subsequently received another warning and then a ticket for not having the title. He again inquired with Mr. Yamaha, but they continued to make excuses, telling him that the lienholder had not released the lien. Finally,

around June 11, Escobar received his title from Mr. Yamaha. By admittedly backdating the title and other documents to May 6, 1998, Mr. Yamaha had made the title transfer based upon a power of attorney purportedly bearing Elias's signature. Elias denied ever signing the power of attorney and claimed it was a forgery.

On June 2, Seavey called Elias and tried to sell him an XP Limited jet ski, a model Elias considered inferior. When Elias refused, the conversation abruptly concluded. A few minutes later, Mike McIntyre, one of the owners of Mr. Yamaha, called Elias and asked what could be done to resolve the problem. McIntyre also tried to convince Elias to buy the XP Limited. Elias replied that they could not resolve the dispute because Mr. Yamaha did not have the jet ski he wanted. Instead, he demanded that McIntyre return his old jet ski so that he could take his business elsewhere. McIntyre said he could not return it because it had been sold; he then became angry and uttered an obscenity[5] before hanging up. Elias and his brother immediately went to Mr. Yamaha. Upon seeing Elias walk into the office, McIntyre asked someone to call the police. Elias demanded the return of the jet ski that had been brought in for repairs, but McIntyre refused and told him they would have to "take it to court and settle it there." Elias waited for the police to arrive and, with their assistance, retrieved his jet ski. A few days later, Elias bought a GSX–Limited jet ski from a dealer in Las Cruces, New Mexico.

On July 14, 1998, Elias filed suit against Mr. Yamaha for breach of contract, DTPA violations, fraud, and conversion. The trial court found in favor of Elias on the breach of contract, fraud, and conversion actions, but found the evidence insufficient to establish the DTPA violations. The

---

4. Elias paid $105 on April 16, 1998, and $500 on May 25, 1998.

5. Elias testified at trial that McIntyre said, "You're acting like a f——ing idiot" and hung up on him.

court awarded actual damages, punitive damages, and attorneys' fees.

## DPTA CLAIM

■ In his first issue on appeal, Elias challenges the trial court's adverse finding on his DTPA claim pertaining to the sale of his trade-in. He asks us to reform the judgment to include an award of treble damages in the sum of $27,742 for a knowing violation of the DTPA. Although he does not specifically raise his contention in terms of either legally or factually insufficient evidence, we interpret his argument to be that he established the DTPA violation as a matter of law.[6] *See Sterner v. Marathon Oil Company,* 767 S.W.2d 686, 690 (Tex.1989).

■ When attacking the legal sufficiency of the evidence to support an adverse finding on an issue for which he had the burden of proof, i.e., challenging the trial court's finding as a matter of law, the appellant must demonstrate on appeal that the evidence conclusively established all the vital facts in support of the issue. *Sterner,* 767 S.W.2d at 690; *Kratz v. Exxon Corp.,* 890 S.W.2d 899, 902 (Tex.App.—El Paso 1994, no writ); *Chandler v. Chandler,* 842 S.W.2d 829, 832 (Tex.App.—El Paso 1992, writ denied). A party attempting to overcome an adverse fact-finding as a matter of law must surmount two hurdles. *Sterner,* 767 S.W.2d at 690. First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. *Sterner,* 767 S.W.2d at 690; *Kratz,* 890 S.W.2d at 902. Second, if there is no evidence to support the finding, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *Sterner,* 767 S.W.2d at 690; *Kratz,* 890 S.W.2d at 902. Only if the contrary position is conclusively established will the point of error

be sustained. *Kratz,* 890 S.W.2d at 902; *Chandler,* 842 S.W.2d at 832.

Citing *Apple Imports, Inc. v. Koole,* 945 S.W.2d 895 (Tex.App.—Austin 1997, writ denied), Elias contends that Mr. Yamaha breached an implied representation that it would not sell his trade-in before completing the purchase of the new jet ski. In *Apple Imports,* the plaintiffs visited the defendant automobile dealership on a Saturday, decided to purchase a used Mazda MX–3, and orally agreed to trade in their Dodge Dynasty. *Apple Imports,* 945 S.W.2d at 897. Because it was late in the day, they could not complete the transaction by executing the necessary documents before the dealership closed for the weekend. *Id.* The plaintiffs left their Dodge at the dealership and took the Mazda home for the weekend, intending to return on Monday and complete the deal. *Id.* During the course of the weekend, however, they changed their minds about the purchase. *Id.* When they returned to the dealership on Monday, they discovered that their Dodge had already been sold to a wholesaler even though the dealership lacked both the plaintiffs' authorization to make the sale and the title to the vehicle. *Id.* The dealership made arrangements to have the plaintiffs' car returned, but the plaintiffs did not pick it up for several months. *Id.* When they ultimately retrieved it, the plaintiffs discovered that it had an additional 800 miles on the odometer and a large scratch on one side. *Id.* The plaintiffs filed suit, alleging DTPA violations and conversion. A jury found in favor of the DTPA violation but found that the dealership had not converted the automobile. *Apple Imports,* 945 S.W.2d at 897. On appeal, the dealership, asserting that its sale of the Dodge was a mere mistake and not a misrepresentation, challenged the jury's finding of a DTPA violation. *Id.* at 898. The Court of Appeals determined

---

6. In his prayer for relief, Elias asks that we reverse and render judgment, rather than reverse and remand. Because the former is the appropriate remedy for a legal sufficiency challenge, and the latter is only appropriate when we sustain a factual sufficiency complaint, we have construed his arguments as challenging only the legal sufficiency of the evidence.

that when the dealership took possession of the plaintiffs' car to determine its trade-in value, it made an implied representation that it would not sell the vehicle until the transaction had been completed and there was a clear showing of a valid and complete transfer of ownership. *Id.* at 898–99. By selling the car before they completed the transaction and secured the title, the dealership violated the implied representation.

We do not read *Apple Imports* to hold that a dealership, upon receiving a trade-in vehicle, must wait for delivery of the new vehicle to the buyer before it sells the trade-in vehicle. Instead, it holds that the dealership could not sell the vehicle without authorization or title. This case is distinguishable because Elias and Mr. Yamaha executed the documents necessary to complete the transaction, including a power of attorney authorizing Mr. Yamaha to sell, transfer, and assign the 1996 jet ski. While Elias denied signing the power of attorney, he admitted that the signature on the document looked like his signature. Recognizing that in a legal sufficiency review, we must examine only the evidence that supports the finding and ignore all evidence to the contrary, we must discount Elias's protests that he did not sign the power of attorney. Viewed in that prism, there is some evidence to support the adverse finding. Because Appellant has failed to overcome the first hurdle, it is unnecessary for us to address the second. Point of Error No. One is overruled.

## LOSS OF USE DAMAGES

■ In Issue Two, Elias contends that the trial court improperly limited his loss of use damages to only four days at the rate of $239 per day, rather than awarding him damages for each of the ninety-one days he was deprived of his new jet ski.[7] Although Elias does not address the standard of review pertaining to this issue, Mr. Yamaha argues that Elias is effectively challenging the legal sufficiency of the evidence to support the trial court's award of damages for loss of use. We disagree that Elias's argument concerns only evidentiary sufficiency. Whether the trial court applied an improper measure of damages is a question of law subject to a *de novo* review, and Elias's brief fairly raises this issue. Additionally, an examination of whether the trial court properly applied the law to the facts implicates the legal and factual sufficiency of the evidence. Because Elias requests us to "modify" the award pertaining to loss of use damages, we interpret his challenge as being directed at only the legal sufficiency of the evidence to support the award. Therefore, we restrict our review to these two issues.

■ Regarding the issue of the proper measure of damages, Mr. Yamaha contends that Elias is not permitted to recover both loss of use damages and the total value of the property that has been lost.[8] We would agree with this argument if the trial court had awarded the loss of use damages in connection with Mr. Yamaha's conversion of the 1996 jet ski. *See Winkle Chevy–Olds–Pontiac, Inc. v. Condon,* 830 S.W.2d 740, 746 (Tex.App.—Corpus Christi 1992, writ dism'd) (holding that a plaintiff who establishes conversion is entitled to either the return of the property and damages for loss of use during the tortfeasor's detention, or the value of the

---

7. The 91–day period represents the time from the date the parties entered into the contract, April 3, 1998, until Elias finally obtain a jet ski on July 3, 1998. The trial court calculated Elias's loss of use damages by multiplying four days by a rental rate of $239 per day. Thus, the court specifically found that Elias suffered loss of use damages in the amount of $956 as a result of Mr. Yamaha's breach of the contract.

8. We note that Mr. Yamaha did not bring its own appeal in order to challenge this aspect of the trial court's judgment. In fact, Mr. Yamaha requests in its prayer that we affirm the trial court's judgment as rendered. Therefore, even if Mr. Yamaha had been correct in this contention, its complaint would be waived.

property); *First Nat'l Bank of Missouri City v. Gittelman,* 788 S.W.2d 165, 169 (Tex.App.—Houston [14th Dist.] 1990, writ denied)(holding that the plaintiff may not generally recover in conversion both for the market value of the property and for loss of use). Here, however, the trial court awarded loss of use damages in connection with Mr. Yamaha's breach of the contract, that is, its failure to deliver the new jet ski.[9] Mr. Yamaha does not direct us to any authority holding that Elias is unable to recover loss of use damages arising from the breach of contract and also recover the market value of the jet ski converted by Mr. Yamaha. Because there are two different injuries, we conclude that Elias may recover both types of damages.

In support of his argument that the trial court applied an incorrect measure of damages and improperly limited his recovery, Elias relies upon *Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115 (Tex. 1984), which addressed the correct method by which to measure loss of use damages for deprivation of the use of a repairable car. *Luna* rejected the argument that in order to recover loss of use damages, a plaintiff had to prove that he actually incurred monetary loss by renting an automobile or expending monies for alternative transportation. *Luna,* 667 S.W.2d at 118. Instead, the plaintiff may establish loss of use by showing the reasonable rental value of a substitute automobile. *Id.* at 119. The Supreme Court also addressed the specific issue before us, that is, the period of compensatory loss. The intermediate appellate court had determined that when the loss of use is over an extended period of time, the proper method of proving reasonable rental value is not by the day, week, or month, but by a sum certain covering the entire period. Emphasizing that "[t]he thing to be kept in view is that the party shall be compensated for the

injury done," the Supreme Court concluded that the period of compensatory loss of use will be the amount of time the plaintiff was deprived of the loss of use of the automobile. *Luna,* 667 S.W.2d at 119. Thus, the rental value, whether by the day, week, or month, is indicative of the loss suffered. *Id.*

Mr. Yamaha asserts that *Luna* is inapplicable here because it is a DTPA case and the trial court below found against Elias on his DTPA claim. We disagree. Even though *Luna* is a DTPA case, its common-sense method of measuring loss of use damages is not limited to DTPA cases and can be applied in other contexts. On the other hand, Elias suggests that *Luna* painted a bright-line rule that he is entitled to recover for the entire period he was deprived of his jet ski regardless of whether he would have actually used it every day. We disagree with his assessment as well. *Luna* emphasized that a rigid and unbending rule is inadvisable and the period of compensation will vary with the character of the property and with the facts of the case. *Luna,* 667 S.W.2d at 119. We interpret this language as requiring courts to consider the particular circumstances of the plaintiff and the facts of each case in assessing loss of use damages. *See Mondragon v. Austin,* 954 S.W.2d 191, 194 (Tex.App.—Austin 1997, pet. denied)(holding that the fact finder should consider the particular circumstances of the plaintiff in determining a compensable period of time for loss of use damages). *Luna* clearly established that the character of the property must be considered in determining loss of use damages. While a jet ski is readily distinguishable from a personal automobile in terms of utility, and while it may be used only seasonally, we are not inclined to limit recovery to established use patterns provided there is evidence to support its intended use.[10] *Clifton v. Jones,* 634 S.W.2d

---

9. The trial court specifically found that "[a]s a result of Mr. Yamaha's failure to comply [with the agreement to sell Elias a 1998 Sea Doo GXS–Limited] Mark Elias suffered damages

as follows: ... $956.00 for the loss of use due to Mr. Yamaha's failure to deliver."

10. We also recognize that recreational vehicles are often considered status symbols by

883, 887 (Tex.App.—El Paso 1982, no writ) (holding that although the plaintiff's proposed use of his airplane was greatly in excess of his recent actual use, there was evidence to support the court's findings); *Carroll v. State Farm Ins. Co.*, 427 So.2d 24, 27 (La.App. 3rd Cir.1983) (appellate court deleted award of damages for loss of use of ski boat where owners failed to offer evidence to show the time period required to make repairs to their boat, and no evidence was introduced showing extent that plaintiffs had actually used the boat in the past or extent to which they were deprived of its use).

 We now turn to whether the trial court properly applied the measure of damages to these particular facts. In considering a legal sufficiency or "no evidence" point, an appellate court considers only the evidence which tends to support the jury's findings and disregards all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex. 1965); *Parallax Corp., N.V. v. City of El Paso*, 910 S.W.2d 86, 89 (Tex.App.—El Paso 1995, writ denied). If any probative evidence supports the jury's determination, it must be upheld. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (Tex.1951); *Parallax Corp., N.V.*, 910 S.W.2d at 89. In a bench trial, a legal sufficiency challenge to the trial court's findings of fact is reviewable under the same standard that is applied in reviewing evidence supporting a jury's answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994); *Schwartz v. Pinnacle Communications*, 944 S.W.2d 427, 432 (Tex.App.—Houston [14th Dist.] 1997, no writ).

The trial court heard evidence that Elias only used the jet ski on weekends and that he never went to the lake until after Memorial Day weekend. In 1998, Memorial Day occurred on May 25 so there were five weekends between Memorial Day and July 2, a Saturday, when Elias obtained his new jet ski. There is no evidence to support a conclusion that he would have only used the jet ski on four of these ten days. Thus, Elias conclusively established that he was deprived of the use of the jet ski for these ten days. Consequently, we find that the trial court improperly limited his loss of use damages to four days. Point of Error No. Two is sustained.

## ATTORNEYS' FEES

 In Issue Three, Elias contends that the trial court should have awarded him attorneys' fees through the entry of judgment in the sum of $18,000 based upon uncontroverted expert testimony rather than limiting the award to $11,000. In awarding attorney's fees, the trial court, as the trier of fact, must take into account various factors such as the nature and complexity of the case, the nature of the services provided by counsel, the time required for trial, the amount of money involved, the client's interest that is at stake, the responsibility imposed upon counsel, and the skill and expertise required. *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 881 (Tex.1990). The allowance of attorneys' fees rests within the sound discretion of the trial court and will not be reversed without a showing of an abuse of that discretion. *Id.* Generally, the testimony of an interested witness, though uncontradicted, does no more than raise a fact issue to be determined by the jury. *Id.* at 882. However, an exception to this rule exists where the testimony of an interested witness is not contradicted by any other witness, or attendant circumstances, and the same is clear, direct, and positive, and free from contradiction, inac-

their owners. Thus, we find some merit to Elias's contention that deprivation of use need not be limited to those periods of time that a watercraft is actually launched in the water. It is not outside the realm of possibility that a boat owner may periodically "use" the boat simply by venturing into the garage to admire it, or to park it in view of the neighborhood. However, to the extent that loss of use damages should be expanded to encompass such a custom, there must nevertheless be evidence to support it. There being no such evidence in the record before us, we need not decide the issue here.

curacies, and circumstances tending to cast suspicion thereon. *Id.; see also Gunter v. Bailey,* 808 S.W.2d 163, 165 (Tex.App.—El Paso 1991, no writ). In such a case, the testimony is taken as true, as a matter of law. *Ragsdale,* 801 S.W.2d at 882. The exception to this interested witness rule is especially true where the opposing party has the means and opportunity of disproving the testimony, if it is not true, and fails to do so. *Ragsdale,* 801 S.W.2d at 882; *Anchor Casualty Co. v. Bowers,* 393 S.W.2d 168, 169–70 (Tex.1965). In other words, failure to contradict is another factor to be considered by the court, but it does not necessarily preclude a finding that a fact issue is raised when there are circumstances in evidence tending to discredit or impeach the testimony of the interested witness. *Id. Ragsdale* does not mandate an award of the amount claimed in every case when uncontradicted testimony is offered. *Id.* If the evidence is unreasonable, incredible, or its belief is questionable, then such evidence would only raise a fact issue to be determined by the trier of fact. *Id.*

Corey Haugland, one of the two attorneys representing Appellant, testified regarding attorneys' fees.[11] Haugland had been involved in similar types of cases in the past and believed a fee in the amount of $125–$175 per hour was a reasonable rate. Although they had a contingent fee contract with Elias, Haugland and Minton maintained billing records indicating that the total amount of fees incurred was $17,712. Both Haugland and Minton had incurred additional time which was not reflected in the billing statement. With those additional hours calculated at a rate of $175 per hour for Haugland and $115 per hour for Minton, the total fees came to approximately $20,000. Admitting that he would trim the bill if he were actually billing Elias for their fee, Haugland suggested that the total attorneys' fees should be reduced by 10 percent or to $18,000 in

order to constitute a reasonable and necessary fee. He specifically stated that $18,000 is a reasonable and necessary fee under what he described as extraordinary circumstances. Although Haugland attempted to put the case on a fast track and handle it at low cost by not taking depositions, the defendant forced him to handle the case at a high cost, especially with regard to attorney time, due to excessive discovery fights and difficulty in obtaining records related to the transactions. Mr. Yamaha did not cross-examine Haugland at all.

Haugland's testimony relating to attorneys' fees was uncontradicted, unimpeached, internally consistent, and readily subject to disproof. Mr. Yamaha chose not to cross-examine him about his testimony or the billing statement he had before him. On appeal, Mr. Yamaha asserts that Haugland's testimony that he would trim the bill by 10 percent is an admission that his bill was inflated, and thus, the trial court could have found that the attorneys' fees testified to by Haugland were also inflated and unbelievable. We disagree that Haugland's testimony permits such a conclusion. Haugland's acknowledgment that he and Minton had been forced to devote an excessive amount of time into the case does not permit a conclusion that the bill is artificially inflated, at least not in the absence of any cross-examination of Haugland or other evidence to establish that the amount of billable time was not a reasonable amount to expend in prosecuting this case. Because none of the surrounding circumstances of the case indicate that the amounts testified to by Haugland are incredible or unreasonable, we find that the trial court abused its discretion in reducing the award of attorneys' fees to $11,000. *See Board of County Comm'rs of County of Beaver Oklahoma v. Amarillo Hosp. Dist.,* 835 S.W.2d 115, 128 (Tex.App.—Amarillo 1992,

---

**11.** Haugland initially filed the DTPA letter but, in order to "hold down costs," he subsequently turned the matter over to one of his associates, Don Minton, after receiving an unsatisfactory response to the letter. Haugland continued to supervise the case.

no writ). Point of Error No. Three is sustained.

Having sustained Points of Error Nos. Two and Three, we modify the portion of the judgment pertaining to the award of loss of use damages and reform it to reflect damages in the amount of $2,390.[12] We further modify the portion of the judgment pertaining to the award of attorneys' fees through trial and reform it to reflect fees in the sum of $18,000. The judgment is affirmed as reformed.

12. This figure represents ten days at a rental rate of $239 per day.