**Jesse F. CLAY, III, Appellant,**

v.

**Michael A. MERCADO, Individually and d/b/a Ocean Gallery, Inc., Appellee.**

No. 08–03–00490–CV.

Court of Appeals of Texas,
El Paso.

July 14, 2005.

Corey Haugland, James, Goldman & Haugland, P.C., El Paso, for Appellant.

Charles E. McDonald, Charles E. McDonald & Associates, Santa Tererea, NM, for Appellee.

Before BARAJAS, McCLURE, and CHEW, JJ.

## OPINION

DAVID WELLINGTON CHEW, Justice.

In this deceptive trade practices case, Appellant Jesse F. Clay, III sued Appellee Michael A. Mercado, Individually and d/b/a Ocean Gallery, Inc., for damages related to the sale of an aquarium system. In a bench trial, the trial court rendered a take-nothing judgment in favor of Mr. Mercado. On appeal, Mr. Clay challenges the legal and factual sufficiency of the evidence to support the trial court's findings that: (1) Mr. Mercado made no material misrepresentation to Mr. Clay which induced him to purchase the aquarium; and (2) Mr. Clay failed to mitigate his damages. We affirm.

In February 2000, Mr. Clay purchased an aquarium system from Mr. Mercado's business, Ocean Gallery, Inc., after a period of negotiations back and forth about the proposed system. By letter, Mr. Mercado provided an amended proposal for the custom aquarium free-standing unit which included, among other things, the following: (1) "one all glass aquarium unit approx. 96 1/2 L × 24 1/2 W × 24 H (240 gallons);" (2) "custom smoked backdrop;" (3) "protein skimmer necessary for saltwater set ups;" (4) "fully automation of lighting system;" (5) "an assortment of stunning exotic saltwater fish. (between 15 to 20);" (6) "a stunning white marble Faux finish of your choice;" and (7) "complete set up and installation." In the proposal, Mr. Mercado stated, "we guarantee that you will have a[sic] most beautiful free standing unit around." Mr. Mercado also made the following statements: (1)"[w]e are [a] good standing member of the Southwest Interior Decorating Network, as well as the B.B.B.;" and (2) the company was offering Mr. Clay the aquarium system "in a full turnkey fashion, for $4,700.00 with guaranteed results."

According to Mr. Clay's testimony, the aquarium unit was installed in his home sometime after February 2000 and before June 2000. A photograph of the unit shows that it was installed on a tile floor. Mr. Clay stated that he and Mr. Mercado mutually agreed to install the aquarium in that location. Mr. Clay testified that he was instructed to fill the tank slowly and then allow the tank to cycle for a minimum of three to four months before putting fish in the tank. He did not put any fish in the tank until December 2000 and those fish died. Mr. Clay spent $315 to replace the initial fish.

In November 2001, Mr. Clay was at home watching television when he heard a crack or pop. He then heard a trickle or leak, and then all of a sudden the entire side of the aquarium tank blew out. The tank began spilling 220 gallons of saltwater, fish, and coral unto the floor. The fish in the tank died. The carpet was soaked and at trial, Mr. Clay testified that the bid to replace the carpet and repair the floor was $2,752.06. After the tank blew out, Mr. Clay called Mr. Mercado and told him that the tank had failed. Mr. Mercado told him not to worry and that he would take care of it. Mr. Clay stated that Mr. Mercado took the aquarium back and returned the refurbished unit in January or February 2002. When the unit was redelivered, Mr. Clay asked that it be left on his covered back porch where it has remained. Even though it was reportedly fixed, Mr. Clay has not put water into it since it was returned to him. Mr. Clay explained that he wanted to make sure it did not leak and was concerned about the plastic reinforcement on the sides of the tank. Mr. Clay tried to discuss the matter with Mr. Mercado on numerous times, but after a while he gave up on getting an answer from him. Mr. Clay has never been able to get the aquarium functioning again.

It was only after his problems with the tank that Mr. Clay determined the aquarium system he had received was different from the system he thought he had purchased pursuant to Mr. Mercado's proposal. Mr. Clay testified that he wanted a glass aquarium and had thought he was purchasing a glass aquarium, as stated in the proposal, but the aquarium he received was made of plastic acrylic. Mr. Clay stated that he first became aware that the aquarium was acrylic, not glass, when it broke in his home. The proposal also stated it would be a 240-gallon aquarium, but Mr. Clay later discovered that it was actually a 220-gallon aquarium. Mr. Clay also complained that he did not receive a custom smoke backdrop, a protein skimmer, a fully automated lighting system with the aquarium, or a stunning white marble faux finish. Although the proposal included an assortment of stunning exotic saltwater fish, Mr. Clay testified that the first batch of fish died within ten days and the second batch died within a week. Further, the proposal stated that the aquarium system would be delivered in a full "turnkey" fashion with guaranteed results, which Mr. Clay understood to mean that the tank would be up and functioning, completely set up, and the fish would be alive. After filing his lawsuit, Mr. Clay also discovered that Ocean Gallery was not a corporation in Texas, but rather is an assumed named for Mr. Mercado. Mr. Clay stated that the representation that the business was a corporation was important to him because "I wouldn't have to worry about it if I had problems. They would take care of it."

At trial, Mr. Mercado's testimony differed considerably from Mr. Clay's account of events. Mr. Mercado testified that he has been operating Ocean Gallery for about eight years and conceded that through a misunderstanding he thought he could use the business name Ocean Gallery, Incorporated. Mr. Mercado explained that in his proposal the exact quantity of water the aquarium could hold was not guaranteed, but rather was an approximation. According to Mr. Mercado, the aquarium system sold to Mr. Clay included a custom smoke backdrop, a protein skimmer, and a fully automated lighting system. Mr. Mercado agreed that the white marble faux finish was not done on the unit, but this change had been at the request of Mrs. Clay who had instructed him to paint it to match the interior walls of the house instead.

Mr. Mercado agreed that the proposal stated that the aquarium would be "all glass," but he stated this was a typographical error. According to Mr. Mercado, he told Mr. Clay that he was going to give him an acrylic aquarium. Mr. Mercado stated that his company does not build glass aquariums and has never built glass aquariums. He also stated that Mr. Clay understood he was getting a custom aquarium made out of acrylic and saw that it was an acrylic aquarium when he went to Mr. Mercado's aquarium manufacturing facility on Lockheed to inspect the aquarium prior to installation. According to Mr. Mercado, he extensively discussed the benefits of acrylic versus glass with Mr. Clay.

According to Mr. Mercado, he installed the aquarium in March 2000. At the time of delivery, Mrs. Clay was practicing Feng Shui and wanted to place the aquarium in a certain location on a tile floor. Mr. Mercado told them that it would leak because the floor was uneven. They both appeared to understand his concern, but they wanted him to install it there anyway. Mr. Mercado explained that if the floor is not level, pressure points will develop. Mr. Mercado does not normally place aquariums on tile floor because tile is not level. Mr. Mercado checked the tile floor in Mr. Clay's home and found that it was not level. However, because the Clays were so persistent, he installed the aquarium at that location even though he knew it would leak.

In Mr. Mercado's opinion, he delivered the aquarium in "turnkey" fashion, that is a complete set up and installation. After turning over the aquarium, the client must begin to service it. Mr. Mercado explained that all clients are instructed that the tank water needs to be cycled. For a saltwater system, the salt is cycled out in order to balance out the salinity level. Within two or three days, the starter fish are then introduced to establish beneficial bacteria (ammonia and nitrate). Mr. Mercado stated that he explains to his clients that the starter fish are going to die in the cycling process. Mr. Mercado also stated that it takes four to six weeks for the tank to cycle and that after it cycles and nitrate level balances, the desired fish are introduced.

After the leak developed in the aquarium, Mr. Mercado refurbished the unit and, per Mr. Clay's instructions, left it on the back porch. Mr. Clay told Mr. Mercado not to worry about the carpet and he did not complain about receiving an acrylic aquarium instead of a glass aquarium. The last time Mr. Clay and Mr. Mercado spoke, Mr. Clay had not done anything with the aquarium and wanted Mr. Mercado to install the aquarium as a fresh water system instead and for free. Mr. Mercado also testified that his representation that he was a good standing member of the Southwestern Interior Decorating Network and the B.B.B. was a correct statement in the 2000 letter proposal.

Basilio Villegas, an employee of Ocean Gallery, testified that he built Mr. Clay's aquarium. Mr. Villegas has twenty years experience doing acrylic work and fabricating aquariums. He stated that the aquarium was returned in order to be refurbished. He had never had one fail before and remembered this aquarium because it was the only one that has ever been returned. Mr. Villegas recalled that when the aquarium was returned, it was bowed out in the middle and in the bottom. Mr. Villegas has never manufactured a glass aquarium, but believed acrylic is stronger than glass. Although Mr. Villegas had never before had to refurbish an aquarium, the aquarium was retested after refurbishment and he was satisfied with the product when it left the shop again.

In Mr. Clay's testimony, he agreed that his wife had attended a Feng Shui class around the time that the aquarium was installed, but denied that her interest in Feng Shui was the deciding factor in placing the aquarium on the tile floor. According to Mr. Clay, Mr. Mercado never advised him not to place the aquarium on the tile floor because the floor was uneven. Mr. Mercado also never told him that the aquarium would have an acrylic tank even though the proposal stated it would be made of glass. Mr. Clay acknowledged that he visited the facility where the tank was manufactured, but at that time the tank was covered in paper and he thought the tank was made out of glass.

Following the bench trial, the trial court entered a take-nothing judgment in favor of Mr. Mercado. Upon request, written findings of fact and conclusions of law were prepared and filed. Pertinent to this appeal, the trial court found:

- Ocean Gallery Inc. is not an existing entity. Instead it was filed as an assumed name in 1995;

. . .

- Ocean Gallery was a member of the Better Business Bureau of El Paso at the time of this transaction;
- While the purchase/proposal order indicated "glass" aquarium, the uncontroverted expert testimony indicated that acrylic is 10 times stronger than glass, 12 times the better insulator and 5 times clearer;
- In addition, Plaintiff visited the plant where said aquarium was being built;
- March 2000, Defendant delivered to Plaintiff an acrylic, 230 gallon plus, free standing custom aquarium;
- Prior to installation, Defendant informed Plaintiff that an aquarium should not be installed on a tile floor.

- November, 2001, a leak developed;
- Plaintiff was home when the leak began, therefore water damage was minimal;
- January, 2002, the aquarium was refurbished by Defendant, and Defendant was instructed by Plaintiff to leave the aquarium outside in the back porch, exposed to the elements;
- June 18, 2002, Plaintiff began calling Defendant requesting Defendant to set up the tank *again*.

In its conclusions of law, the court determined:

- There was no material misrepresentation made by Defendant to Plaintiff which induced Plaintiff to purchase the aquarium.
- Plaintiff failed to mitigate his damages.
- Plaintiff shall take nothing from his lawsuit.

## STANDARDS OF REVIEW

In a bench trial, factual and legal sufficiency challenges to the trial court's findings of fact are reviewable under the same standards that are applied in reviewing evidence supporting a jury's answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994); *Elias v. Mr. Yamaha, Inc.*, 33 S.W.3d 54, 62 (Tex.App.-El Paso 2000, no pet.). However, the findings are not conclusive when a complete reporter's record appears in the appellate record. *Gibson v. Bostick Roofing and Sheet Metal Co.*, 148 S.W.3d 482, 489 (Tex.App.-El Paso 2004, no pet.). We review a trial court's conclusions of law *de novo*. *See Austin Hardwoods, Inc. v. Vanden Berghe*, 917 S.W.2d 320, 322 (Tex.App.-El Paso 1995, writ denied).

In reviewing a legal sufficiency challenge where the complaining party on appeal did not bear the burden of proof at trial, we analyze the issue as a "no-evidence" challenge. *Croucher v. Croucher,*

660 S.W.2d 55, 58 (Tex.1983). In our review, we consider the evidence in a light that tends to support the jury's finding and disregard all evidence and inferences to the contrary. *Southwest Key Program, Inc. v. Gil–Perez,* 81 S.W.3d 269, 274 (Tex. 2002). If there is more than a scintilla of evidence to support the finding, the legal insufficiency challenge fails. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex. 1998). We will sustain a no-evidence challenge when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003).

When attacking the legal sufficiency of the evidence to support an adverse finding on an issue for which it had the burden of proof, i.e., challenging the trial court's finding as a matter of law, the appellant must demonstrate on appeal that the evidence conclusively established all the vital facts in support of the issue. *Sterner v. Marathon Oil Company,* 767 S.W.2d 686, 690 (Tex.1989); *Elias,* 33 S.W.3d at 59. A party attempting to overcome an adverse fact-finding as a matter of law must surmount two hurdles. *Sterner,* 767 S.W.2d at 690; *Elias,* 33 S.W.3d at 59. First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. *Sterner,* 767 S.W.2d at 690; *Elias,* 33 S.W.3d at 59. Second, if there is no evidence to support the finding, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *Sterner,* 767 S.W.2d at 690; *Elias,* 33 S.W.3d at 59. Only if the contrary position is conclusively established will the point of error be sustained. *Elias,* 33 S.W.3d at 59.

In reviewing an issue asserting that a finding is factually insufficient or against the great weight and preponderance of the evidence, we consider all the evidence, both the evidence tending to prove the existence of a vital fact, as well as the evidence tending to disprove its existence. *Heritage Resources, Inc. v. Hill,* 104 S.W.3d 612, 620 (Tex.App.-El Paso 2003, no pet.). We will set aside the judgment only if the supporting evidence is so weak or the finding so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965).

## MISREPRESENTATION CLAIMS UNDER DTPA

In his first issue, Mr. Clay challenges the trial court's adverse finding on his DTPA claim. Specifically, Mr. Clay contends that the evidence was legally and factually insufficient to support the trial court's finding that Mr. Mercado made no material misrepresentation to Mr. Clay which induced him to purchase the aquarium.[1]

The Deceptive Trade Practices Act ("DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce...." Tex.

---

1. Arguably, the trial court's statement was a finding of fact, rather than a conclusion of law and was mislabeled as such. The trial court's designation of a "finding of fact" or "conclusion of law," however, is not controlling, and we may treat a conclusion of law as a finding of fact when appropriate. *Ray v. Farmers State Bank of Hart,* 576 S.W.2d 607, 608 n. 1 (Tex.1979).

Bus. & Com.Code Ann. § 17.46(a)(Vernon Supp.2004–05). To recover under the DTPA, the plaintiff must show that: (1) he is a consumer; (2) the defendant engaged in a false, misleading, or deceptive act; and (3) the act constituted a producing cause of the plaintiff's damages. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex.1995); *see also* Tex. Bus. & Com.Code Ann. § 17.50(a). To establish the producing cause element, the plaintiff must show that the defendant's action was a substantial factor in bringing out the plaintiff's injury, without which the injury would not have occurred. *Doe*, 907 S.W.2d at 478.

Mr. Clay asserted that Mr. Mercado violated the following provisions in the laundry list of specifically prohibited acts contained in Section 17.46(b):

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

. . .

(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

. . .

(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

. . .

(25) using the term 'corporation,' 'incorporated,' or an abbreviation of either of those terms in the name of a business entity that is not incorporated under the laws of this state or another jurisdiction.

*See* Tex.Bus. & Com.Code Ann. § 17.46(b)(5), (7), (12) & (25).

■ On appeal, Mr. Clay contends that contrary to the trial court's finding, Mr. Mercado made material misrepresentations concerning: (1) the material and size of the aquarium; (2) the turnkey status and guaranteed results of the aquarium system; and (3) the corporate status of Ocean Gallery, Inc. Mr. Clay asserts that these deceptive acts were a producing cause of his damages.

Viewing the trial court's adverse finding in the appropriate light, we conclude there was evidence at trial that supports the finding. Mr. Mercado testified that the amended proposal stated all-glass aquarium, but Mr. Clay knew that he would be receiving an acrylic aquarium. Mr. Clay visited the manufacturing facility where only acrylic aquariums were being manufactured. With regard to the size of the aquarium, we observe that the amended proposal states that the size was only an approximation. Further, Mr. Mercado testified to the same. While Mr. Clay testified that he understood "turnkey" to mean complete installation and with live fish, Mr. Mercado testified that he instructs all of his clients about the dynamics of an aquatic ecosystem and the necessary death of the starter fish in the process. According to Mr. Mercado, he delivered the aquarium in a "turnkey" fashion, which does not include service and maintenance. Mr. Clay agreed that he and his wife were delighted with the aquarium when it was delivered.

At trial, Mr. Mercado admitted that he had misrepresented the corporate statute of Ocean Gallery, Inc., however, the evidence showed that this misrepresentation

was not material and was in no way the cause in fact of Mr. Clay's damages.[2] *See Doe*, 907 S.W.2d at 481. Based on testimony from Mr. Mercado and Mr. Villegas, the evidence shows that a leak developed in November 2001 (over a year and a half after delivery and installation) because it was installed on a tile floor upon Mr. Clay's insistence.

Because there is some evidence in the record to support the trial court's finding that no material misrepresentations were made to Mr. Clay, the legal sufficiency challenge fails. In addition, after reviewing Mr. Clay's factually insufficient evidence complaint, we conclude that the supporting evidence is not too weak nor is the finding against the great preponderance of the evidence as to be clearly wrong and manifestly unjust. Issue One is overruled. Given our disposition of Mr. Clay's first issue, we need not consider his second issue, that is, the sufficiency challenge to the finding on Mr. Mercado's affirmative defense of mitigation of damages.

We affirm the trial court's judgment.

**2.** We note that Mr. Clay testified that Mr. Mercado's representation was important to him, but he never indicated that he relied on this particular representation. Furthermore, there was no evidence that this representation had anything to do with the failure of the tank.