# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00404-CV

**Canyon Vista Property Owners Association, Inc., Appellant**

**v.**

**Gerald H. Laubach, Appellee**

## FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT
## NO. C2007-0104A, HONORABLE DIB WALDRIP, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Canyon Vista Property Owners Association appeals a judgment in favor of one of its condominium owners, Gerald H. Laubach, for the Association's breach of its duty under the Condominium Declaration for Canyon Vista Condominiums (Declaration) to repair the subfloor of Laubach's second-story unit. After a jury trial, the trial court entered a judgment enjoining the Association to repair Laubach's floor by paying a licensed contractor up to $19,413.63 to perform the necessary work and, to the extent the Association expends less than that amount, to pay Laubach the difference between $19,413.63 and the amount it actually expends. The judgment also awarded Laubach $8,100 in actual damages for loss of use plus attorney's fees. The Association asserts that the trial court had no subject-matter jurisdiction over Laubach's claims for individual damages, Laubach was not entitled to recover a monetary award for damages to the common areas, there was no evidence to support an actual damages award in excess of $600, and the trial court erred in admitting evidence of insurance. For the following reasons, we modify the portion of the

trial court's judgment awarding Laubach actual damages in the amount of $8,100 by reducing that award to $2,100 and affirm the judgment as modified.

## BACKGROUND

The Association filed a lawsuit against Laubach, owner and resident of one of the condominiums within the Canyon Vista Condominium community, for failure to pay assessments and fees due to the Association. After first filing a general denial, Laubach later filed a counter-petition alleging that the Association had breached the Declaration of the condominium community by failing to repair the floor of his unit. By the time the cause came to trial, the Association's claims against Laubach had been settled, as he had paid the outstanding assessments and fees.

Laubach testified at trial that shortly after his purchase of his second-story condominium (unit E7) in July 2004, he noticed problems with the floor. Specifically, the floor produces unusually loud noises and flexes abnormally when walked upon. Laubach testified that his kitchen cabinets shake when his nineteen-pound dog scratches. Laubach lodged a complaint with the Association a few months after purchasing his condominium, and while the Association did inspect his unit and acknowledge the problems identified by Laubach, it failed to take any corrective measures.[1]

At trial, Laubach's expert witness, Jeff Young, confirmed Laubach's concerns about his floor. Young stated that the floor has "an unnatural bounce or deflection to it," moves in

---

[1] It was after several unsuccessful attempts to get the Association to adequately respond to his concerns about his floor that Laubach—who had been current on payment of his fees—ceased making payments in protest. This was the context in which the Association filed suit against Laubach.

an "unnatural way" when one walks across it, and makes significant noise, all of which are well beyond the norms for wood floors on the second story of a condominium complex. Young prepared an estimate of the necessary measures and expenses to repair the floor by limiting or correcting the noise and bounce. To perform the necessary repairs, Young testified, Laubach would have to vacate the unit and remove his belongings, and the living room and kitchen would have to be gutted from the floor up. The carpeting and vinyl flooring would have to be removed, as would the kitchen cabinetry and a pony wall separating the kitchen and living room. The repairs would entail removing the floor decking, installing new, manufactured "micro-lam" joists to sandwich the existing ones, reinstalling insulation, attaching new decking, installing new carpeting and vinyl flooring, re-building the pony wall, and replacing the cabinetry and counter tops.

Young testified that the inexpensive solution proposed by the Association's witness—installing some screws to fasten the existing plywood to the existing joists—might reduce some of the noise but would not reduce the deflection because the real problem existed with the joists and subfloor itself, not the plywood decking. In Young's experience, the preferred method to stiffen a floor in these circumstances, especially one with a long span such as that in Laubach's unit, is to strengthen the joists by sandwiching them with micro-lam structural members. Young believed his proposal to be the most economical way to properly fix the problems with the floor in Laubach's unit. His proposal estimated the cost of these repairs at a minimum of $28,699.96.

Young's written estimate contained line-items for the various repairs and materials he recommended, including amounts for items such as the labor to install a garbage disposal (even though Laubach's unit did not already have one installed), supplying of new plumbing fixtures (even though Young conceded it might be possible to salvage Laubach's current ones), and wiring for certain appliances such as a microwave (even though Laubach's unit did not already have one).

3

Young testified that the kitchen counter tops would necessarily have to be replaced with new ones after being removed to repair the floor, as they consisted of laminate on top of particle board and were likely to deteriorate in the removal process. He indicated that the cabinetry would also likely have to be replaced with new cabinets, as they were also made of particle board and not structurally strong enough to be removed and reinstalled. The carpet and vinyl flooring would also have to be replaced with new materials. The estimate also included additional line items for optional upgrades such as higher-quality counter tops and flooring surfaces, which amounts were not included in the $28,699.96 figure.

Attached to Young's estimate was a report from an engineer, Gaylord E. Reaves. Based on the portion of the subfloor he investigated, Reaves confirmed that the problem with Laubach's floor was structural, that the subfloor lacked lateral "compression blocking" between the joists, and that the joists had no toenails fixing the joists to the top plates of the first floor wall studs, causing the deflection. He opined that the lack of blocking reduces the stiffness of the individual joists and allows them to twist and warp, as well as increasing the risk of fire spread between units.

Article 14 of the Declaration outlines the duties and powers of the Association. Among the listed duties, the Association is required to

> maintain or cause the Common Elements and the landscaping, improvements, facilities and structures thereof to be maintained and kept in good state of repair, and acquire for the Association and pay from assessments for such services, furnishings, equipment, maintenance, painting, including exterior painting and repair as it may determine are necessary in order to keep and at all times maintain the Common Elements and the landscaping, improvements and facilities thereon in a good and sanitary state of condition and repair.

4

The Declaration defines "General Common Elements" (sometimes referred to in the Declaration as "Common Elements") to include the "foundations, columns, girders, beams, supports, main walls, and roofs" as well as "[a]ll other parts of the property necessary or convenient to its existence, maintenance and safety, or normally in common use." The Declaration also indicates ownership of the common elements: they "shall be owned in common by the owners and shall remain undivided. Each owner shall own an undivided interest in the General Common Elements." The parties did not dispute the fact that Laubach's subfloor falls within the Declaration's definition of "Common Elements." Their dispute centered around the extent and cost of necessary repairs and the extent to which Laubach might be responsible for causing the damage to his floor.

Laubach testified that he filed his counterclaim to seek repair of his floor, reimbursement of his legal expenses, and compensation for the loss of enjoyment of his home for the nearly six years since he moved in. After the close of evidence and argument of counsel, two questions were submitted to the jury. The first asked whether the Association breached Article 14 of the Declaration. The jury answered in the affirmative and therefore was instructed to answer the second question: "What sum of money, if paid now in cash, would fairly and reasonably compensate Gerald Laubach for his damages, if any, for the repairs to and loss of use of his condominium unit resulting from the occurrence in question?" The damages question contained two sub-parts with defined elements of damages: "cost of repairs" and "loss of use of condominium unit." Regarding loss of use, the jury was instructed to: "Consider the reasonable value of the use of the condominium unit in the same class as the condominium unit in question for the period of time required to repair the damage, if any, caused by the occurrence in question." For cost of repairs, the jury answered $19,413.63. For loss of use, the jury answered:

5

$ 600 rent
$1,500 moving storage
$6,000 loss of use

_____

$8,100

However, the court's charge provided only one blank line for loss-of-use damages and did not segregate or define loss-of-use damages by type.

In entering its judgment, the trial court enjoined the Association to make the necessary repairs to Laubach's floor—outlining several specific repair measures that it was required to take—and, to the extent the Association pays a licensed contractor less than $19,413.63, it was ordered to pay Laubach the difference between that amount and $19,413.63. The Association filed a motion for new trial complaining of the trial court's award of actual damages for loss of use in an amount greater than $600 and its admission of evidence about the Association's insurance coverage.

**Laubach's standing to sue and right to recover damages**

In its first and second issues, the Association asserts that Laubach had no standing to bring this lawsuit and recover monetary damages and that therefore the trial court had no subject-matter jurisdiction over his claims. The Association claims that Laubach has no cause of action individually for damages to the common elements because such damages were suffered by the Association, not Laubach, and that the governing condominium Declaration does not grant condominium owners the right to sue for damages to the common areas. Standing is an element of subject-matter jurisdiction that cannot be waived and may be raised for the first time on appeal. *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993). Therefore, even though the Association did not raise this issue with the trial court, we must address it.

Under Texas law, condominium ownership combines separate ownership of individual units with joint ownership of common elements. *See* Tex. Prop. Code § 81.002(3). In conformity with this statute, the Declaration here grants each owner an undivided interest in the common elements. The Association's issues ask us to consider whether a condominium owner, who holds common elements in co-tenancy with the other condominium owners, has standing to bring a cause of action for damages to the common areas.

A co-tenant in a condominium project may proceed alone, individually, to seek redress in the form of damages for misuse of common property, absent any objection by the condominium association that the other co-tenants must be joined. *See Scott v. Williams*, 607 S.W.2d 267, 271 (Tex. Civ. App.—Texarkana 1980, writ ref'd n.r.e.). Absent objection by the association, the co-tenant may proceed with the action, recovering only the amount to which he shows himself entitled according to his proportionate interest in the common property. *Id.*; *see also* Tex. Prop. Code § 81.201(b) (statute allowing council of owners to institute litigation on behalf of two or more condominium owners concerning matter related to common elements does not limit right of condominium owner to bring action on own behalf); *Celotex Corp., Inc. v. Gracy Meadows Owners Ass'n, Inc.*, 847 S.W.2d 384, 390 (Tex. App.—Austin 1993, writ denied) (individual owner may bring action on own behalf to recover proportionate share of damages for injury done to common element). The Association did not object to Laubach's proceeding without joinder of all or any other co-tenants or to his recovery of more than his proportionate share of damages to the floor of unit E-7. In fact, the Association agreed without objection to the submission of the question asking the jury to determine Laubach's damages for his loss of use of and repairs to his unit; the jury was not asked to award Laubach damages for injury to the common elements.

7

With respect to a suit for equitable relief to protect and preserve the common property, a plaintiff may proceed individually without joining co-tenants even upon the association's objection. *See Cameron v. MacDonell*, 659 S.W.2d 911, 913 (Tex. App.—Corpus Christi 1983, no writ); *Board of Directors of By the Sea Council of Co-Owners, Inc. v. Sondock*, 644 S.W.2d 774, 778-79 (Tex. Civ. App.—Corpus Christi 1982, writ ref'd n.r.e.); *Scott*, 607 S.W.2d at 271. And, "[a]n owner who suffers harm specific to his own property may, of course, always sue in his own behalf, even if the harm is somehow 'related' to common elements." *Celotex*, 847 S.W.2d at 390.

Whether Laubach's cause is deemed an action for damages or for equitable relief, the case law is clear that—as a co-tenant of the common elements, which includes his unit's floor—Laubach had standing to bring this suit and recover damages.[2] *See Scott*, 607 S.W.2d at 271. Accordingly, we overrule the Association's first and second issues.

**Loss-of-use damages**

The Association's third issue asserts that there was no evidence to support the jury's award of loss-of-use damages to Laubach in an amount exceeding $600. Laubach testified that the problems with his floor caused him to suffer six years of loss of enjoyment of his property. He also testified that the necessary repairs will require him to temporarily move out of his condominium

---

[2] The Association cites two cases in support of its position on standing, but we find these cases distinguishable and inapplicable here. *See Myer v. Cuevas*, 119 S.W.3d 830 (Tex. App.—San Antonio 2003, no pet.) (holding that because defendant property owners association filed plea to jurisdiction and specific denial on basis of standing and asserted that necessary parties of plaintiff's fellow co-tenants had not been joined, individual owner of condominium lacked standing to sue association without joining co-tenants); *Mitchell v. LaFlamme*, 60 S.W.3d 123 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (in townhome project where governing restrictive covenants declared that property owners association, rather than home owners, owned common areas, appellate court held that owners of townhomes did not have personal property interest in common areas entitling them to sue for damages to repair those areas).

and incur moving and replacement lodging expenses. He estimated that he could find replacement lodging for $600.00 to $750.00 for the approximate month it will take to complete the repairs. His moving and storage expenses were estimated to be $3,600. Although the jury's charge form included only one line for loss-of-use damages, the jury answered by writing in three separate items of damages: "$600.00 rent"; "$1500.00 moving storage"; and "$6000 loss of use."

We review a no-evidence point by considering all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998). If there is any evidence of probative force, *i.e.*, more than a mere scintilla, to support the jury's findings, the appellate court will overrule the point. *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951).

As a general rule, the fact finder has broad discretion in assessing damages where the law provides no precise legal measure, and so long as a rational basis for the calculation of damages exists, the jury's findings will not be disregarded merely because the jury's reasoning in arriving at its figures may be unclear. *First State Bank v. Keilman*, 851 S.W.2d 914, 930 (Tex. App.—Austin 1993, writ denied). A jury may not, however, arbitrarily assess an amount neither authorized nor supported by the evidence presented at trial. *Id.*; *Mills v. Jackson*, 711 S.W.2d 427, 434 (Tex. App.—Fort Worth 1986, no writ). Fact finders must consider the particular circumstances of the plaintiff and the facts of each case in assessing loss-of-use damages. *Elias v. Mr. Yamaha, Inc.*, 33 S.W.3d 54, 61 (Tex. App.—El Paso 2000, no pet.); *Mondragon v. Austin*, 954 S.W.2d 191, 194 (Tex. App.—Austin 1997, pet. denied); *see Luna v. North Star Dodge Sales, Inc.*, 667 S.W.2d 115, 119 (Tex. 1984) (citing with approval *Craddock v. Goodwin*, 54 Tex. 578 (1881), for proposition that no rigid rule applicable to all cases applies when determining loss-of-use damages and that

9

measure must necessarily vary with the character of property and circumstances of case; key consideration is how to compensate party for injury done).

The universal rule for measuring damages for breach of contract is just compensation for the loss or damage actually sustained. *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991); *Shaffer v. Frink*, No. 03-01-00564-CV, 2002 WL 822268, at \*4 (Tex. App.—Austin May 2, 2002, no pet.) (not designated for publication) (holding trial court did not err in awarding damages for both loss of use and loss of sale in breach-of-contract action). The purpose of damages in contract cases is to restore the injured party to the position he would have been in had the contract been performed and, therefore, considerations of what additions to the injured party's wealth have been prevented by the breach and what subtractions from his wealth have been caused by it are appropriate. *Shaffer*, 2002 WL 822268, at \*4.

The entirety of the evidence Laubach presented of his damages that could be considered to compensate him for his "loss of use" of Unit E-7 was his own testimony about: the cost of temporary lodging for the duration of the repair period ($600-$750); an estimate he received from Arrow Moving and Storage for the moving and storage of his belongings for the duration of the repair period ($3,600); and his inability to fully enjoy his property for the approximate six years that he endured the squeaking, bouncing floor in his home. The Association complains about the jury's award of damages for the two amounts other than the cost of temporary lodging: "$1500 moving storage" and "$6000 loss of use."

Actual damages in contract actions are either direct or consequential. *Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). Direct damages are those that flow naturally and necessarily from the breach and compensate for the loss, damage, or

injury that is conclusively presumed to have been foreseen or contemplated by the party as a consequence of his breach of contract. *Id.* Consequential damages are those that result naturally, but not necessarily, from a breach of contract and are recoverable only if they are foreseeable and directly traceable to the wrongful act and result from it. *Id.* Loss-of-use damages reasonably fall under the category of consequential damages, if not direct damages. *See Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 121 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (plaintiff's decision to install temporary transformer and use it while its main transformer was being repaired was lost-use damage and, under facts, consequential rather than direct); *Tennessee Gas Pipeline Co. v. Technip USA Corp.*, No. 01-06-00535-CV, 2008 WL 3876141, at *8 (Tex. App.—Houston [1st Dist.] Aug. 21, 2008, pet. denied) (mem. op.) (holding that contract's exclusion of recovery for incidental and consequential damages, including loss of use, did not preclude recovery of direct damages involving loss of use when those losses directly resulted from breaching party's delay). Here, the trial court did not instruct the jury about direct or consequential damages but merely charged it to assess damages for repairs and loss of use.

With respect to the $1,500 for moving and storage, there was evidence supporting an award for this element of damages of up to $3,600 in the form of Laubach's testimony about the estimate he received from Arrow Moving and Storage. A reasonable jury could find that moving and storage expenses result naturally from the Association's duty to "maintain" or "cause to be maintained" the common element consisting of Laubach's subfloor, and there was sufficient evidence supporting the jury's finding on this issue. Moving and storage expenses may reasonably fall within the category of "loss of use," as one of the uses of a home is to store one's belongings. Indeed, the Association would not be able to meet its contractual duty to "maintain" and "keep in good repair" the subfloor of Laubach's unit if Laubach's belongings were not removed from

11

the condominium. Because there was evidence supporting Laubach's contention that the repairs would require him to move his belongings out of his home for the duration of the repair period, the jury was justified in finding that expenses associated therewith are a form of actual damages that he will suffer as a result of the Association's breach. It is a loss for which the cost of rent on temporary lodging will not compensate him, and we hold that the jury's award of $1,500 damages to Laubach compensating him for moving and/or storage of his belongings was supported by legally sufficient evidence.

We thus turn to the remaining portion of "loss of use" damages the jury awarded: $6,000. Laubach was able to and did, indeed, continue living in his condominium during the six years that the floor remained unrepaired and during which the Association failed to repair it. While Laubach testified that his enjoyment and use of his condominium over the past six years was hindered by the condition of the floor, there was no evidence of any diminution in value caused by the defective floor during this period, and no expert or other witness assigned a proportionate value on the use of normally functioning floors. Because there was no evidence of the reduced value of the use or enjoyment of Laubach's condominium on account of the floor, there was nothing in evidence from which the jury could have awarded this type of "loss of use" damages. Laubach's counsel did mention some methods by which the jury might calculate damages for Laubach's "loss of use and enjoyment" of his home—for instance, by postulating that about $10 per day for the six years Laubach endured the floor problems in his home is reasonable—but such statements were argument, not evidence. We conclude that there was legally insufficient evidence to support the jury's award of $6,000 in "loss of use" damages.[3]

_____

[3] Also, to the extent that the $6,000 "loss of use" award falls into the category of compensation for Laubach's mental anguish for having to live with the bouncing, squeaking floor

Moreover, the court's charge did not even contemplate past loss of use, as it instructed the jury to consider "the reasonable value of the condominium unit . . . *for the period of time required to repair the damage*." (Emphasis added.) Where the party asserting insufficient evidence to support a damage award did not object to the charge as submitted and did not otherwise raise an issue concerning the charge, the question for the appellate court is whether there is legally sufficient evidence to support the jury's answer in light of the instruction *as submitted*. *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex. 1985). To the extent the $6,000 awarded by the jury for "loss of use" pertained to a period in the past, the jury was not authorized by the charge to award such damages. To the extent the $6,000 was for damages reasonably anticipated to be incurred during the repair period and consisting of something other than rental payments for temporary lodging or costs for moving and storing Laubach's belongings, there was no evidence supporting an award for damages in any form other than these two categories. Accordingly, we sustain the Association's third issue as to the court's award of actual damages in an amount exceeding that awarded by the jury for rent and moving/storage. Because there was evidence supporting the jury's award of "loss of use" damages in the amounts of $600 and $1,500, but not in the additional amount of $6,000, we will modify the portion of the trial court's judgment awarding Laubach actual damages, reducing it from $8,100 to $2,100.

_____

for six years, the supreme court has held that non-economic damages are recoverable in breach-of-contract actions only when the duty owed by the breaching party arises out of certain special relationships, such as the physician-patient relationship, and that mental anguish is not a compensable result of injuries to property interests. *See City of Tyler v. Likes*, 962 S.W.2d 489, 495-96, 498 (Tex. 1997). There is no suggestion in this case of any special relationship that could impose such a duty on the Association with respect to Laubach.

**Evidence of insurance**

In its last issue, the Association asserts that the trial court abused its discretion in admitting testimony about whether the Association has insurance coverage and that the trial court's error was harmful, requiring reversal. On direct examination, James Horner, one of the Association's board members, responded to a line of questioning by the Association's counsel asking about the sources of funding for the Association's account from which it pays for things such as repairs to common areas. Horner testified that "there's no condo fairy, so [the money] comes from the . . . owners of the units." He further elaborated that the condominium owners pay a monthly fee of $140 plus an annual assessment "for the insurance" and a loan the Association took out to refurbish the buildings and pool. The Association's counsel further pursued the subject, asking Horner, "So if the members of the jury were to render a verdict against the association requiring that the association pay to have Mr. Laubach's unit remodeled, who would be paying that bill?" Horner replied, "The owners, the other owners."

On cross-examination, Laubach's counsel attempted to further probe the issue of "the insurance" raised by Horner:

> Q:  Mr. Horner, just a few questions, you indicated in response to
>      Mr. Weber's questions that part of what the association pays
>      for every month is insurance; isn't that right?
> A:  No.  The insurance is assessed once a year.
> Q:  All right.  Now—

At that point, the Association's counsel objected, arguing that evidence of insurance is inadmissible. At a bench conference, Laubach's counsel argued that the Association had opened the door to this line of questioning by telling the jury that the repair expenses would be borne exclusively by the other owners and leaving the jury with the impression that there was no possibility that

14

insurance would pay any of the costs. Laubach's counsel indicated to the court that because the Association had opened the door by bringing up the issue of insurance and the source of payments for repairs, he was entitled to clear up any false impression Horner's previous testimony had left upon the jury. The trial court overruled the Association's objection but allowed it to present evidence that the Association's insurance carrier had already denied coverage for its claim for repairs of Laubach's floor.

On further cross-examination, Horner admitted that the Association had a liability insurance policy in place and that it had asserted a claim against that policy. Although the insurer had denied the claim, Horner admitted that the Association had already instituted legal proceedings against the insurer based on the denial and that it might ask the insurer to reconsider its denial if Laubach was awarded damages in this lawsuit. On re-direct, Horner was asked again about who would be responsible to pay the costs and, based on the insurance company's denial of the claim, he repeated his earlier testimony that the condominium owners would foot the bill and, under then-present circumstances, the insurance company was not paying any amount of the repairs.

Evidence that a person was or was not insured against liability is not admissible upon the issue of whether the person acted negligently or otherwise wrongfully. Tex. R. Evid. 411; *Ford v. Carpenter*, 216 S.W.2d 558, 559 (Tex. 1949). However, the mention of insurance before a jury is not always reversible error. *University of Tex. v. Hinton*, 822 S.W.2d 197, 201 (Tex. App.—Austin 1991, no writ). To demonstrate reversible error, the party appealing must show: (1) that the reference to insurance probably caused the rendition of an improper judgment in the case; and (2) that the probability that the mention of insurance caused harm exceeds the probability that the verdict was grounded on proper proceedings and evidence. *Dennis v. Hulse*, 362 S.W.2d

15

308, 309 (Tex. 1962); *Hinton*, 822 S.W.2d at 201. The record as a whole must show harm to the complaining party. *Hinton*, 822 S.W.2d at 201.

Impeaching evidence on collateral matters that affect the credibility of a witness or party is clearly admissible. *Royal v. Cameron*, 382 S.W.2d 335, 342 (Tex. Civ. App.—Tyler 1964, writ ref'd n.r.e.). The rule of admissibility of evidence of this nature should be liberal, and the trial judge should have the discretion to receive any evidence which gives promise of exposing falsehood. *Id.* "The Courts of this state have uniformly held that when one injects an improper issue into a lawsuit, he cannot be heard to complain when his testimony is rebutted by other improper evidence." *Id.* at 341 (holding that plaintiff's testimony that he had not seen doctor because he did not have money to do so opened door to defense counsel's eliciting on cross-examination that at time of accident, plaintiff had health and accident insurance policy from which benefit payments would be applied to his doctor bills, and such testimony about insurance coverage was offered for limited purpose of impeachment and was thus admissible).

We conclude that the Association opened the door to being cross-examined on the issue of its insurance coverage, as Horner admitted on direct examination that the Association carried insurance. Additionally, besides Horner's testimony, we also note that evidence of insurance was cumulative because it was already before the jury, as Article 15 of the Declaration requires the Association to maintain general liability insurance in full force and effect at all times, and the entirety of the Declaration was admitted into evidence. Moreover, Laubach's counsel sought to cross-examine Horner on the issue of insurance for the purposes of impeachment and to ensure that the jury was not misled by the Association's claims that the only possible source of payment for repairs would be the assessments and dues paid by other owners, when the Association had already taken the legal position with the trial court that its insurance carrier had wrongfully denied

16

its claim of coverage. Because the evidence was for limited, proper (*i.e.*, non-liability) purposes and because the Association's witness had already opened the door on the subject, we conclude that the trial court did not err in overruling the Association's objection and admitting the evidence pertaining to insurance.

However, even if the admission of the evidence concerning insurance coverage was improper, we conclude that the error was harmless. The Association was permitted to counter the admission of the existence of insurance coverage with evidence that its insurance carrier had already denied its claim and that the Association had not decided whether it would file suit against the carrier because of the denial. This evidence more likely than not weighed in favor of the Association. Also, the trial court's charge to the jury included the following admonishment: "Evidence that a party was or was not insured against liability was admitted solely for your consideration, if at all, for the limited purpose of rebutting a defensive theory, and you shall not and will not consider the existence of liability insurance for any other purpose, including but not limited to liability, if any, of any party." We must presume the jury obeyed the instruction of the trial court and disregarded the existence of insurance for any purpose other than rebutting the Association's defensive theory. *Hinton*, 822 S.W.2d at 201. We also note that the insurance policy limits were never disclosed to the jury.

Furthermore, in its closing argument, the Association reiterated that although it has an insurance policy in place, the insurer had already denied its claim and that although the Association might further pursue the issue with the insurer, there was no guarantee of coverage and that the other condominium owners would most likely, essentially, be paying for Laubach's repairs. Finally, the jury's finding on both liability and damages are sufficiently supported by the evidence. There was no dispute that the subfloor in Laubach's condominium constituted a common element, and the

17

Declaration clearly imposed a duty on the Association to maintain common elements. The necessity, extent, and cost of repairs sought by Laubach were supported by the testimony of a licensed contractor as well as the report of a licensed engineer. Yet, the jury did not award the full amount of the repair estimate but nearly $10,000 less than that sum. We conclude that the record does not show harm to the Association as a result of the admission of the insurance evidence or that its admission probably caused an improper judgment or that the likelihood of harm outweighed the likelihood that the verdict was based on proper proceedings and evidence. We overrule the Association's fourth issue.

## CONCLUSION

For the foregoing reasons, we modify the trial court's judgment by reducing its award to Laubach of actual damages from $8,100 to $2,100 and affirm the judgment, as modified.

_____

Jeff Rose, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Modified and, as Modified, Affirmed

Filed:   January 31, 2014

18